UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex* *rel*. | * | |
| | * | |
| RAVI SRIVASTAVA<br>9172 Chestnut Grove Road<br>Frederick, Maryland 21701 | * | **CIVIL FALSE CLAIMS ACT**<br>**COMPLAINT FILED UNDER** |
| | * | **SEAL PURSUANT TO 31 U.S.C.**<br>**§ 3729,** *et seq* |
| Plaintiff-Relator, | * | |
| v. | * | **DO NOT PLACE IN PRESS BOX.** |
| | * | **DO NOT ENTER IN PACER.** |
| TRIDENT USA HEALTH SERVICES,<br>930 Ridgebrook Road # 3<br>Sparks, MD 21152-9390 | * | |
| | * | |
| and | * | |
| | * | |
| Mark Parrish,<br>CEO of TRIDENT USA HEALTH<br>SERVICES | * | |
| | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## COMPLAINT AND JURY DEMAND

Plaintiff-Relator, Ravi Srivastava, by and through his undersigned counsel, brings this *qui tam* action in the name of the United States of America and the State of Maryland against the above named Defendants (hereinafter collectively referred to as "Defendants").

1.      This is an action to recover damages and civil penalties arising from false claims being submitted to the federal government for services provided to Medicare Recipient Facilities and skilled nursing facilities ("SNFs").

2.      As outlined in more detail below, Defendants' illegal activities center on overbilling and illegally charging for ancillary services to beneficiaries of federally-funded health care programs.  Such service for which Defendants filed false claims include fraudulently billing for transportation expenses, falsely billing for portable X-ray tests not furnished under the appropriate level of supervision by a physician, using false computer-generated or default diagnosis codes (ICD-9-CM ) for Medicare billing, hiring radiologists outside of the United States to read x-rays, changing claims' "Dates of Service" in order to receive higher reimbursement, and providing substandard portable X-ray services to skilled nursing facilities. Additionally, Defendants failed to bill and/or collect amounts due from patients or third parties for unmet deductibles, coinsurance, and copayments for portable X-ray and diagnostic testing services.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter  pursuant to 28 U.S.C.§ 1331 and 31 U.S.C. § 3732 because this action arises under the laws of the United States.  This Court has pendant jurisdiction over the State FCA claims pursuant to 31 U.S.C. 3732(a).

4.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).

5.      Venue is proper in this District because Defendants resided, transacted business, and can be found in this judicial district.

## PARTIES

6.      Plaintiff-Relator has more than 17 years of experience as a senior executive in information technology and systems application in the health care industry, and more than 25 years of experience overall in IT,  systems applications, and programming.

7.     The Plaintiff-Relator commenced his employment with TRIDENT USA

HEALTH SERVICES ("Trident") in 2010 as its Chief Information Officer ("CIO"). The

Plaintiff-Relator worked in Trident's corporate headquarters in Sparks, Maryland. He worked

closely with all the top executives of Trident and the board of directors.

8.     Defendant Trident is a privately-owned, venture capital funded, company.

Trident declares on its website that:

> Services are offered through a network of subsidiary companies,
> each with its own core specialty or specialties, many of which
> interact with and support each other. With a national platform
> currently servicing 550,000 beds, TridentUSA provides
> tremendous reach in the market and possesses the potential to
> expand services far into adjacent markets.

> TridentUSA's services are the high quality and low cost alternative
> for healthcare providers and for Medicare, presenting the option of
> in-house bedside exams as an alternative to transporting patients to
> the hospital. The cost for TridentUSA's services, delivered directly
> to patients in their rooms, is well below half the cost of hospital
> visits.

> Currently, the market leader in over 30 states, TridentUSA
> provides services to over 10,000 post-acute facilities across 34
> states. TridentUSA maintains customer relationships with over
> 5,200 skilled nursing facilities (SNFs) throughout the country,
> making it the only entity of its kind able to effectively service
> national accounts.

> Additionally, TridentUSA now provides laboratory services in 7
> states, however plans to expand to several more states.
> TridentUSA also expects to leverage its relationships and
> infrastructure to begin providing outsourced services in podiatry,
> dentistry, audiology, and optometry in late 2011 or early 2012.

> Driven by an aging population along with acuity and cost
> containment efforts in post-acute facilities, Trident USA is
> uniquely positioned to leverage its scalable platform, experienced
> management team and customer relationships to organically grow
> its existing relationships and markets.

Trident has been created by acquiring multiple companies. Therefore, it has a complex asset structure comprising multiple subsidiaries. (*See* Exhibit 1) Trident management has folded these acquisitions under four major subsidiaries. Trident does all of its business and derives all of its revenues through these four 100% owned subsidiaries. Mr. Srivastava was the CIO for all four of the subsidiaries. The four subsidiaries are:  (1) Symphony Diagnostic Services No.1, Inc. d/b/a MobilexUSA (www.tridentusahealth.com/Mobilexusa.php), (2) Kan-Di-Ki, LLC d/b/a Diagnostics Laboratories & Radiology (www.tridentusahealth.com/DL.php), (3) U.S. Lab & Radiology, Inc. (www.tridentusahealth.com/USLab.php) and (4) Rely Radiology (www.tridentusahealth.com/relyradiology.php).

Trident's business operations are divided into Trident East and Trident West divisions. MobilexUSA and U.S. Lab & Radiology are under Trident East division, while Diagnostic Laboratories & Radiology is under Trident West division.  Each division is further divided into multiple geographical regions, each of which is headed by a Regional Vice President.

9.      Defendant Mark Parrish, a resident of the State of Maryland, has held the position of CEO and Chairman of the Board of Directors of TRIDENT since September 2008.  He was Mr. Srivastava's direct superior.

**BACKGROUND**

10.      Medicare is the federal health insurance program established in 1965 by Title 18 of the Social Security Act, 42 U.S.C. § 1395 *et seq.*  Medicare covers certain disabled people, as well as people age 65 and older, regardless of their income or medical history.  Coverage extends to about 46 million Americans.

11.      Medicare is organized into four parts: Part A pays for inpatient hospital stays, skilled nursing facility stays, home health visits (also under Part B), and hospice care, and,

- 4 -

excluding home health, accounted for 35% of benefit spending in 2010.

Part B covers physician visits, outpatient services, preventive services, and home health visits, and, excluding home health, accounted for 27% of benefit spending in 2010.

Part C is known as the Medicare Advantage program through which beneficiaries can enroll in a private health plan, such as a health maintenance organization (HMO), and receive all Medicare-covered benefits.

Part D is the voluntary, subsidized outpatient prescription drug benefit program.

12.     The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers Medicare. However, most of the daily administration and operation of the Medicare program is managed through contracts with private insurance companies that operate as "Fiscal Intermediaries."

Fiscal Intermediaries accept and pay reimbursement claims under Medicare Part A and some claims under Part B.  Acceptance and payment of claims under Medicare Part B are completed through "Medicare Carriers."

13.     The False Claims Act provides, in pertinent part, that any person who: (a)(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (a)(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; ... is liable to the United States Government for any civil penalty of not less than $5,000 and not more than $10,000, ... plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729. For purposes of the False Claims Act, the terms "knowing" and

"knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b) (1986).

14.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996,28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

**A.     Trident Improperly and Knowingly Billed Both Medicare Part A and Part B for Transportation Expenses.**

15.     Medicare payments come in two types:

> **Medicare Part A (Facility Billed) –** Under a prospective payment system, Medicare pays a single payment for a single Medicare Part A beneficiary to cover a defined period of time or the entire inpatient stay (for example, per diem for 90 days or per stay) to the Facility. With certain exclusions, the payment covers all the health care services that are medically necessary under skilled nursing facilities consolidated billing. Providers bill Skilled Nursing Facility instead of Medicare for the services they have provided to patients in the Facility. A patient who remains an inpatient can exhaust the Part A benefit and become a Part B beneficiary. Under Part A, Medicare pays a facility and the facility pays a provider based on the bills submitted by the provider.

> **Medicare Part B (Medicare Carrier Billed)** – Part B payments for treatment are paid by Medicare through carriers or Medicare contractors. Once a patient has exhausted Part A benefit, all medically necessary services to the patient are billable to Medicare under Part B. Providers of medically necessary services bill Medicare not the Facility. Therefore, for Part B, Medicare pays a provider through a Medicare carrier or contractor based on the bills submitted by the provider.

16.     Medicare Transmittal 343, change request 3280 dated October 29, 2004 on the topic of "Clarification: Modifiers for Transportation of Portable X-rays (R0075)", states

Medicare policy that "Medicare allows a single transportation payment for each trip the portable X-ray supplier makes to a particular location."

17.     In other words, whether one patient is seen at a location, or six patients are seen at a single location in one day, Medicare only allows a single transportation payment for the trip that the portable X-ray supplier makes to a particular location. "When more than one Medicare patient is X-rayed at the same location, the single fee schedule transportation payment is prorated among all the patients receiving the services."

18.     In a senior executive operations meeting, in January 2011, Trident CEO Mark Parrish approved development of an algorithm so that one full transportation fee would be billed to facilities under Part A, in addition to normal billing of transportation to Medicare under Part B.  The Plaintiff-Relator was directed to have his software developers design and develop the algorithm. When questions were asked about this task, Trident General Counsel Tom McCaffrey claimed that there was nothing illegal about it. However, he offered no documentation or detailed explanation to support his defense of the planned action.

19.     In the first quarter of 2011, Trident developed an algorithm to always charge full transportation to Medicare Part A, instead of pro-rating portable X-ray transportation among Medicare Part A and Part B patients.

20.     Simulations of the new algorithm ran in March and April 2011 and showed a monthly revenue increase of $220,641.68 on the Trident East side.  Trident East projected annualized revenue increased by $1,521,000 after considering that about 75% of the facilities would not be able to detect it.

21.     After several simulations, the portable X-ray transportation algorithm was implemented for the majority of skilled nursing facilities in June/July 2011 under Trident East division.

22.     A similar portable X-ray transportation calculation model for Medicare overbilling was implemented at the Trident West division that increased projected annualized revenue by $478,122.

23.     After In-House Diagnostic Services and Southern Radiology Services were acquired and folded into MobilexUSA, and integrated with the Trident East division in the last quarter of 2011, this same transportation calculation algorithm was implemented for overbilling Medicare and their skilled nursing facility clients.

**B.     Trident Improperly and Knowingly Charged Medicare for Non-Physician Ordered X-Rays**

24.     Medicare coverage of portable X-ray services is governed by federal laws and regulations and CMS policy. The Code of Federal Regulations (CFR) provides licensing, registration, staffing, and safety requirements for portable X-ray suppliers. (Applicable regulations are found at 42 CFR § 486.100 through 42 CFR § 486.110).  In particular, 42 CFR § 486.106 requires that portable X-rays be ordered by a physician, defined by that regulation as a licensed medical doctor (MD) or doctor of osteopathy (DO). The order must specify, in writing, both the reason for the X-ray service and the need for portable services. Portable X-ray, like all diagnostic tests, also "must be ordered by the physician who is treating the beneficiary … and who uses the results in the management of the beneficiary's specific medical problem." 42 CFR § 410.32(a).

25.     In February 2012, Alan Morrison, Vice-President of Trident authored a letter to

Marilyn Tavenner, Acting Administrator of CMS, asking for future clarifications and seeking changes to allow portable X-rays to be ordered by non-doctors.

A few weeks later, by letter dated February 24, 2012, the CMS Deputy Director replied to the Trident letter, stating the applicable and governing policy as follows:

> 42 CFR § 486.106 indicates that "portable X-ray examinations are performed only on the order of a doctor of medicine or doctor of osteopathy licensed to practice in the State." While the many examples in your letter provide general references to diagnostic X-ray tests and non-physician practitioners, this regulation is explicit in restricting payment of portable X-ray examinations to only those ordered by doctors of medicine and doctors of osteopathy.

> Given this limitation in the regulations, we cannot pay for portable X-rays ordered by non-physician practitioners under current policy. However, we agree that Medicare should pay for the portable X-ray services ordered by non-physician practitioners just as we do for other diagnostic tests they order. For this reason, we are considering making a change to our regulation as part of the 2013 physician fee schedule rulemaking cycle.

26.     CMS, in a Medicare Advisory Release, also reiterated to X-ray providers the long-standing rule that Medicare only permits doctors to order X-rays.

> As a result of the OIG report:

> Medicare contractors have been notified of questionable billing patterns of portable X-ray suppliers.

> The report focuses on several issues; however, contractors have been instructed to review previously paid claim data as far back as 2009. The referring provider information is being examined to determine if the service was referred by a doctor of medicine or doctor of osteopathy.

> Services not referred by a doctor of medicine or doctor of osteopathy are considered non-covered and overpayment collections will be initiated.

> The recovery efforts are being pursued under 42 CFR 405.980, which under subsection (b) allows contractors to reopen an initial determination up to four years after the initial determination when good cause is established, as described in 42 CFR 405.986. The Centers for Medicare & Medicaid Services (CMS) maintain that the OIG's discovery of these claims provides good cause for the reopenings to determine overpayment potential.

In addition to previously paid services being reviewed and overpayments collected, new claims submitted for these services, which are not referred by a doctor of medicine or osteopathy, will be denied.

27.    Trident, despite the governing regulations, long permitted the ordering of portable X-rays from non-doctors.  Signing off paper requisitions by non-physicians has been a common practice at Trident's subsidiaries --MobilexUSA, Diagnostic Laboratories and US Labs -- supported by training and false interpretations in Trident's compliance manuals.

28.    In addition, Trident's systems allowed for, and fostered, the utilization of non-physician ordered portable X-rays. For example, whenever a National Provider ID was entered in the ordering system and that ID did not match with a legitimate number in the provider database, by default, Trident's system labeled the unknown entity as "Doctor Mobilex". The order from that unknown entity was then accepted in the system. Finally, this entry was "scrubbed" before the claim was billed to Medicare or the skilled nursing facility.

**C.    Trident Improperly and Knowingly Failed to Bill and/or Collect from Patients or Third Parties for the Amounts Due for Portable X-Ray and Diagnostic Testing Services for Unmet Deductibles, Coinsurance, and Copayments**

29.    In a document published by Medicare on claims submission guidelines (Medicare Claim Submission Guidelines - ICN906764), Medicare provides the following guidelines for filing of Medicare claims (at 12):

> You must collect unmet deductibles, coinsurance, and copayments from the beneficiary. The deductible is the amount a beneficiary must pay before Medicare begins to pay for covered services and supplies. These amounts can change every year. Under Fee-For-Service Medicare and Medicare Advantage Private Fee-For-Service Plans, coinsurance is a percentage of covered charges that the beneficiary may pay after he or she has met the applicable deductible. You should determine whether the beneficiary has supplemental insurance that will pay for deductibles and coinsurance before billing him or her for them. In some Medicare health plans, a copayment is the amount that the beneficiary pays

for each medical service. If a beneficiary is unable to pay these charges, he or she should sign a waiver that explains the financial hardship. If a waiver is not assigned, the beneficiary's medical record should reflect normal and reasonable attempts to collect the charges before they are written off. The same attempts to collect charges must be applied to both Medicare beneficiaries and non-Medicare beneficiaries. Consistently waiving deductibles, coinsurance, and copayments may be interpreted as program abuse.

30.     Medicare's Fraud and Abuse Guide further states as follows:

The purpose of requiring the patient to pay a part of the cost of medical care is to encourage the patient to cooperate in limiting cost by not incurring unnecessary expenses and to take an interest in the reasonableness and necessity of all services received. The routine and consistent waiving of the collection of coinsurance and deductibles defeats this purpose."

31.     The Guide further states (at 16):

Routine waiver of deductibles and copayments by charge-based providers, practitioners, or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare.

32.     In January and February 2011, Trident's management started positioning Trident for purchase and hired Huron Healthcare Consulting (www.huronconsultinggroup.com) to analyze Trident's billing and collection processes.

33.     Huron found that Trident had a very significant receivable amount from third party payers and patients that was long outstanding for collection and far more than 90 days from date of service.   In other words, Trident ignored collection of payments from commercial insurance companies, state administered Medicaid, Blue Cross and other/self-payers.

34.     Huron found that Trident had a routine lack of follow-up regarding self-payments and routinely wrote-off large receivable amounts without any significant collection effort.

35.     By failing to make the Medicare-required collection efforts, Trident's business model served as inducement to its skilled nursing facilities client base.   Trident's contracts with

facilities provided that, if the facilities failed to timely obtain health insurance or payer information, then the amounts that could not be billed to the payer due to lack of such information would be billed to the facilities.  When Trident regularly wrote-off the owed amounts, this practice and custom turned into inducements to facilities, encouraging facilities to do business with Trident.

36.     This inducement reduced facilities' interest in collection and provision of correct insurance payer information, thus encouraging utilization of Medicare-paid services, which raised Medicare costs, since the majority of the cost had to be paid by Medicare, instead of being reasonably shared among patients/beneficiaries, third-party payers and Medicare, as required.

37.     Similarly, Trident's non-collection of self-pay balances was an inducement to patients/beneficiaries for higher utilization as Medicare requires patients to pay a part of the expense for health care, so that patients take an active interest in controlling health care costs.

38.     When Trident wrote-off patient-payable parts of the Medicare cost, these write-offs became inducements to patients to increase utilization of Medicare-provided health care services by effectively making these services free to patients.

39.     In May and June 2012, after a discussion on the "collectibles" with Bill Glynn, President of Trident East Division, the Plaintiff-Relator instructed Jim Leary, Director of Trident East Applications, to work with Lynn Meadows, Vice President of Revenue Cycle and Steve Fisher, Vice President of Revenue Cycle Technology and Reporting, to prepare a business case to reduce the high rate of denials.  The project was never implemented during the Plaintiff-Relator's employment, and the Plaintiff-Relator was terminated just weeks later.

40.     Trident failed to collect secondary insurance information when accepting orders for portable x-ray and ultrasound services, and lacked processes for obtaining said secondary

insurance and responsible party information after the fact.

41.     Trident assured skilled nursing, assisted living and hospice facilities, that its

workflow and processes would require lesser effort from them.  This meant that Trident and its

subsidiaries would not ask the facilities to produce patient eligibility information, insurance

information, responsible financial party information and, very often, even diagnosis information

at the time the facilities placed orders for Trident's and subsidiaries' services.  Trident and

subsidiaries then used whatever information the facility provided (if any) and inputted that

"minimal information" for billing the long-term care facilities under Part A and Medicare under

Part B. Any missing needed information was either filled in from previous orders/bills or left

blank resulting in unpaid bills that Trident frequently wrote-off.

42.     Trident and subsidiaries did not hold the facilities responsible for providing the

insurance and diagnosis information. Due to lack of insurance information for billing, Trident

West and subsidiaries used census (number of patients who are occupying beds on a given day at

the long-term care facility) information to enumerate Medicare Part A and Part B eligibility. As a

result, Trident West regularly received overpayments from Medicare for Part A patients who

were billed as Part B.  Not requesting the needed information from long-term care facilities was

part of the "inducement" that Trident and subsidiaries promised the facility/clients, because this

practice lowered the cost of the facilities' operations.

> **D.      Trident Improperly and Knowingly Created False Computer-Generated or Default Diagnosis Codes (ICD-9-CM ) and Used Them for Medicare Billing**

43.     Per 42 CFR§ 424.32(a)(2), a basic requirement for all Medicare payments is that a

claim for physician services must include appropriate diagnostic coding for those services using

ICD-9-CM. CMS determines Medicare payment amounts for clinical laboratory testing on the

basis of a laboratory fee schedule that is approved by the US Congress each year. The amount of

Medicare payment for a claim is, inter alia, determined by the diagnosis code. According to

CMS Medicare claims processing manual all claims submitted to the Medicare contracted carrier

must have a diagnosis code to identify the patient's diagnosis/condition. Further, CMS requires a

physician or an appropriately authorized non-physician practitioner to provide the diagnosis code

for laboratory testing.

44.     CMS OIG Compliance Plan for Laboratories established in 1998, states as

follows:

> Laboratories should not: (1) Use information provided by the physician or other
> authorized individual from earlier dates of service (other than standing orders, as
> discussed below at paragraph 4); (2) create diagnosis information that has
> triggered reimbursement in the past; (3) use computer programs that
> automatically insert diagnosis codes without receipt of diagnostic information
> from the ordering physician or other authorized individual; or (4) make up
> information for claim submission purposes. Laboratories should: (1) Contact the
> ordering physician, authorized person on the physician's staff or other individual
> authorized to order tests to obtain information in the event that such information
> was not provided; and (2) accurately translate narrative diagnoses obtained from
> the physician or other authorized individual to ICD-9-CM codes. Where medical
> documentation is obtained from a physician or other authorized individual after
> receipt of the specimen and the requisition form, it should be maintained."

45.     Between April 16 and April 18, 2012, the Plaintiff-Relator convened a meeting

with all of his direct reports, specifically, Joyce Philbin, Jose Ferrel, Anthony Draye, Steve

Waxman and Jim Leary, to discuss the possible replacement of, or an upgrade to, Trident's

computer system, called DL-LIS, that controlled operations of Diagnostic Laboratories in

Burbank, California.

46.     During that meeting, Steve Waxman, who had programmed DL-LIS system,

informed the Plaintiff-Relator about "billing optimizations" in the DL-LIS computer system.

Mr. Waxman reported that if a diagnosis code was missing from a laboratory test, the computer

system was programmed to automatically generate a diagnosis code and fill that in, so that the

test could be billed to Medicare. This diagnosis code was generated to conform to the results of

the diagnostic test.[1]

47.     Trident management (other than the Plaintiff-Relator) directed Mr. Waxman to

program the DL-LIS laboratory information computer system in such a way that, whenever a

diagnosis code (ICD-9-CM ) was missing and the laboratory test generated an "out-of-range"

result, the DL-LIS computer would fill in a computer-generated diagnosis code inferred from the

result.

48.     When Plaintiff-Relator asked Mr. Waxman for an estimate of revenue this

"billing optimization" was generating, Mr.Waxman's response was "easily tens of thousands …"

The     49.     Plaintiff-Relator communicated this serious noncompliance issue to Defendant

Mark Parrish on April 25, 2012.

50.     Although, on the surface, Defendant Parrish voiced that this was an illegal

activity and told the Plaintiff-Relator to follow-up with the Compliance Officer, Kim Upshaw,

upon information and belief, Plaintiff-Relator believes that Defendant Parrish was already aware

of this noncompliance.

### E.     Trident Improperly and Knowingly Charged Medicare for Radiological Services Performed Outside of the United States

51.     The law is well-established in that it is unlawful to bill Medicare for radiological

services performed outside the United States.  Medicare law (*i.e*., Section 1862(a)(4) of the

Social Security Act) prohibits payments for items and services furnished outside the United

---

[1] For example, if a blood test revealed anemia and the ICD-9-CM diagnostic code was missing
from the order, the computer program would automatically fill that in by searching and finding
the ICD-9-CM diagnostic code for anemia.

States except for certain limited services.  Further, the law has only the following three exceptions to the "foreign" exclusion: (1) inpatient hospital services for treatment of an emergency in a foreign hospital that is closer to, or more accessible from, the place the emergency arose than the nearest U.S. hospital that is adequately equipped and available to deal with the emergency, provided either of the following conditions exist: (a) the emergency arose within the U.S.; or (b) the emergency arose in Canada while the individual was traveling, by the most direct route and without unreasonable delay between Alaska and another State; (2) inpatient hospital services at a foreign hospital that is closer to, or more accessible from, the individual's residence within the U.S. than the nearest U.S. hospital that is adequately equipped and available to treat the individual's condition, whether or not an emergency exists; and (3) physician and ambulance services in connection with, and during, a foreign inpatient hospital stay that is covered in accordance with (1) or (2) above.

52.     Trident and its subsidiary, Rely Radiology (http://www.relyradiology.com), regularly billed Medicare for radiology reading services performed outside the United States. The Plaintiff-Relator first discovered this practice in January 2011, when Sue Otis, the Chief Operating Officer of Rely Radiology, mentioned that she was aware that some of the radiologists, including Jason Liu, were reading X-rays from their overseas homes in Taiwan, China and Thailand.  Dr. Liu is the Executive Medical Director of Rely Radiology.

53.     The Plaintiff-Relator, over the next few months, learned that Dr. Liu had, for several years, been allowed to read X-rays from outside the United States.

54.     From January 1, 2012 through January 6, 2012, Dr. Liu performed 2,486 X-ray readings (or interpretations) from Taiwan, an average of approximately 355 X-ray interpretations per day, or about 44 X-ray interpretations per hour in an 8-hour work day.

- 16 -

55.     Trident had allowed another radiologist, Walter Uyesugi, D.O, to read X-rays from Thailand between January 24, 2012 and February 10, 2012 and Trident billed Medicare as if they had been read in the United States.

56.     In January 2012, the Plaintiff-Relator submitted an incident report to Defendant Parrish about this Medicare violation. The incident report, in pertinent part, stated:

> On January 6, 2012, at 11:10 PM Eastern IT became aware that Dr. Jason Liu was accessing the TelRadX system to perform radiology interpretations from Taipei, Taiwan.  IT was able to track Dr. Liu's location from his contact into the Helpdesk for assistance connecting to the system as well as from a trace of his laptop's VPN access. From IT's records, Dr. Liu's locations:
>
> 1. December 31, 2011 – in the US at 7:27pm
> 2. January 2, 2012 – in Hong Kong, China at 7:21pm
> 3. January 6 - 7, 2012 – in Taiwan
> 4. January 7, 2012 – in US: Newport Beach, CA at 9:30pm ET
>
> Ravi was notified about the Helpdesk issue with Dr. Liu and he spoke with Dr. Liu on Friday, January 6, 2012 at 10:36pm ET.  Dr. Liu confirmed that he was getting support from Helpdesk. After this, Ravi contacted Sue Otis, who recommended blocking Dr. Liu from reading the TelRadX system in light of our compliance with the February 2007 Medicare Transmittal #66 (which is detailed below). Next day following Sue's instructions IT restored Dr. Liu's access to the system on Saturday and his location was confirmed within US.

57.     After this "incident report", the Plaintiff-Relator, in February 2012, got Trident to change its billing practice in this one aspect – it separated out from its billing X-rays that were read from outside the United States.  Trident, however, did not report itself as to its past Medicare violations.

58.     Upon information and belief, these Medicare violations started sometime in 2007 and continued through 2011.

### F.     Trident Improperly and Knowingly Changed Dates of Service to Move Medicare Claims From Medicare Part A to Medicare Part B

59.     In December 2011, the Plaintiff-Relator was reviewing turnaround time for

portable X-ray services.  Turnaround time is the elapsed time that starts when a phone call for an X-ray order is received and ends when an X-ray technician actually completes the X-ray examination. The Plaintiff-Relator noticed negative turnaround times, which meant that X-ray technician had completed X-ray examination before the order was even received. The Plaintiff-Relator asked Jim Leary, Director of Applications, to investigate this issue.

60.     On December 14, 2011, Jim Leary followed up with John Basile, Manager of Clinical Applications, and reported back to the Plaintiff-Relator that Trident USA Health Services' account executives were retrospectively changing dates of service of X-ray examinations to move claims from Medicare Part A to Medicare Part B.  Since Trident's account executives' incentive compensation was commission based on revenue and client retention, account executives were incented to change the dates of service.

61.     Part A claims are billable to SNFs, who are paid a fixed amount by Medicare under the prospective payment system.

62.     After changing the dates of service, Trident billed the claims to Medicare under Part B instead of billing the SNF.

63.     The result was that Medicare ended up paying the same claim twice, once to the facility under Medicare Part A prospective payment system, and again to Trident under Medicare Part B.

64.     The Plaintiff-Relator discussed this compliance issue with Defendant Parrish who again directed him to Kim Upshaw, the Compliance Officer.  When the Plaintiff-Relator followed up with Ms. Upshaw, she told him that this practice had been going on for several years.

65.     The Plaintiff-Relator mentioned this subject to CFO John Lanier in January 2012

and suggested that Trident refund the monies to Medicare. CFO Lanier was noncommittal and never again spoke to the Relator about this subject. To the best of the Relator's knowledge, Trident did not take any steps to refund the excess amounts received from Medicare.

**G.** **Trident Improperly and Knowingly Provided Substandard Portable X-ray Services to SNFs and Medicare Beneficiaries**

66.     Trident USA Health Services has been aware that the professional radiology services provided by its fully-owned subsidiary Rely Radiology group are extremely substandard.

67.     Defendant Parrish is fully aware of the situation as multiple regional heads of Trident have provided this information to him during several quarterly business reviews.

68.     In September 2011, the MobilexUSA business unit prepared a document that tracked SNF facilities inquiring about re-read requests or perceived errors in X-ray interpretation by Rely Radiology group.  Per study done by Trident's management, Trident-owned Rely's X-ray reading error rate was significantly higher than its competitors.

69.     Some examples of perceived errors that were confirmed, or required sending the patient to hospital, are as follows:

> ➢ X-ray interpretation originally stated abdominal obstruction; patient was sent to the hospital; no obstruction was seen.
> ➢ X-ray interpretation originally ruled out osteoarthritis but after re-read osteoarthritis was seen in both hips.
> ➢ X-ray interpretation ruled out fracture but after re-read fracture of lateral left clavicle was seen.
> ➢ X-ray interpretation missed non-displaced femoral neck fracture of the left hip.
> ➢ X-ray interpretation missed acromion fracture.
> ➢ X-ray interpretation missed tibia fracture.
> ➢ X-ray interpretation missed 2nd digit fracture.
> ➢ X-ray interpretation missed rib fractures.
> ➢ X-ray interpretation missed rib fractures.

➤ X-ray interpretation ruled out fracture but after re-read intertrochanteric fracture with impaction was seen.

➤ X-ray interpretation fracture was not reported originally as old chip fracture; patient was sent to hospital.

➤ X-ray interpretation ruled out fracture, per re-read old right pubic rami undisplaced fracture was seen.

➤ X-ray interpretation ruled out rib fracture, per re-read old right fifth rib fracture was found.

➤ X-ray interpretation pneumothorax was not seen, patient sent to hospital.

➤ X-ray interpretation made no mention of fracture that was in the splint.

➤ Claim ruled out fracture, per re-read angulated fracture at the distal shaft of metacarpal was seen.

➤ X-ray interpretation ruled out fracture, per re-read acute fracture 3rd digit was found.

➤ X-ray interpretation no pneumonia seen on film, patient sent to hospital with pneumonia.

➤ X-ray interpretation: four views were sent; only one was interpreted.

➤ X-ray interpretation missed dislocation.

➤ X-ray interpretation missed foreign body.

➤ X-ray interpretation patient was sent to hospital, no fracture found.

➤ X-ray interpretation missed rib fracture.

➤ X-ray interpretation missed olecranon avulsion fracture.

➤ X-ray interpretation missed ankle fracture.

➤ X-ray interpretation missed distal radius fracture.

➤ X-ray interpretation missed atelectasis and elevated diaphragm.

➤ X-ray interpretation missed fracture.

➤ X-ray interpretation patient was sent to hospital with pneumonia, per re-read no evidence of pneumonia.

➤ X-ray interpretation related patient sent to hospital with infiltrate, per re-read no infiltrates seen.

➤ X-ray interpretation nurse thinks report incorrect, per re-read RLL infiltrate was seen.

➤ X-ray interpretation missed ankle fracture.

➤ X-ray interpretation missed foot fracture.

➤ X-ray interpretation missed rib fracture.

➤ X-ray interpretation missed fracture.

➤ X-ray interpretation missed fracture.

➤ X-ray interpretation missed fracture.

➤ X-ray interpretation missed foreign body.

➤ X-ray interpretation missed infiltrate.

➤ X-ray interpretation missed non displaced fracture of 5th digit.

➤ X-ray interpretation missed fracture at the greater tuberosity of humeral head.

➤ X-ray interpretation missed fracture of olecranon.

- ➢ X-ray interpretation missed non displaced fax of the left mandible.
- ➢ X-ray interpretation patient sent to hospital with pneumonia, per re-read modest infiltrate with effusion.
- ➢ X-ray interpretation missed displaced hip fracture.
- ➢ X-ray interpretation infiltrate not identified.
- ➢ X-ray interpretation patient sent to hospital, no fracture seen.
- ➢ X-ray interpretation ortho found fracture on the same X-ray film.
- ➢ X-ray interpretation missed fracture caught at hospital.
- ➢ X-ray interpretation missed fracture on left.
- ➢ X-ray interpretation missed fracture at right hip.
- ➢ X-ray interpretation missed fracture proximal fibula.
- ➢ X-ray interpretation missed dislocation.
- ➢ X-ray interpretation missed metallic implanted port.
- ➢ X-ray interpretation missed pubic rami fracture.
- ➢ X-ray interpretation missed foreign body.
- ➢ X-ray interpretation missed displaced screw in hardware.
- ➢ X-ray interpretation missed 5th and 6th rib fracture.
- ➢ X-ray interpretation no fracture found at hospital. Per re-read skin folds.
- ➢ X-ray interpretation missed trochanter fracture.

70.    This lack of quality of X-ray services was a deliberate act by Trident, since Trident's low pay rate encouraged radiologists to earn on volume of X-ray interpretations rather than quality. Trident ignored quality issues in favor of paying below market $5 per X-ray interpretation to radiologists. This piece rate system encouraged radiologists to read at a high speed, which resulted in a high error rate.

71.    The top three highest reading radiologists of Trident USA Health Services were reading average of 434 to 539 X-rays per day. Often each X-ray interpretation got less than a minute from a radiologist.

72.    In order to achieve high throughput of X-ray image reading, which was necessary to maintain high profitability for private equity investors, Trident significantly reduced the resolution of X-ray images taken by digital X-ray machines by tuning its X-ray reading computer systems in such a way that the resolution of X-ray images was reduced to speed up faster downloads and uploads for faster reading.

73.    The quality of X-ray interpretation service provided by Trident fails to meet the threshold of professional standard of quality per Social Security Act §1819.

74.    Trident has been charging professional fee from Medicare for "defective" reading of these X-rays by its radiologists.

### COUNT I
### (All Defendants)

### (31 U.S.C. § 3729(a)(1)(A) Federal False Claims Act)
### (Md. Code Ann. (Health General) § 2-602 Maryland False Claims Act)
### (Knowingly Presenting a False or Fraudulent Claim)

75.    Plaintiff re-alleges and incorporates by reference all allegations in the Complaint as if specifically reiterated herein.

76.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government and/or State of Maryland false or fraudulent claims for payment or approval.

77.    Defendants knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.  These claims were, therefore, false or fraudulent claims submitted for payment or approval to the United States and/or State of Maryland in violation of 31 U.S.C. Section 3729(a) (1).

78.    The United States, and/or the State of Maryland, unaware of the foregoing circumstances and conduct of Defendants, and in reliance on the accuracy of said false or fraudulent claims, made payments to Defendants, which resulted in the United States and the State of Maryland being damaged in an amount to be established at trial or upon motion.

## COUNT II
### (All Defendants)

**(31 U.S.C. Sec. 3729 (a) (1)(B) Federal False Claims Act)**
**(Md. Code Ann. (Health General) § 2-602(A)(2)**
**Maryland False Claims Act)**
**(Knowingly Making, Using, or Causing to be**
**Made or Used, a False Record or Statement)**

79.     Plaintiff re-alleges and incorporates by reference all allegations in the Complaint as if specifically reiterated herein.

80.     By virtue of the acts described above, Defendants made, used, or caused to be made or used, false records and statements to get the false and fraudulent claims allowed and paid.

81.     The United States and/or the State of Maryland, unaware of the foregoing circumstances and conduct of Defendants, and unaware of the falsity of the records and or statements made, used, or caused to be made or used by Defendants, and in reliance on the accuracy thereof, paid the false or fraudulent claims submitted it, which resulted in the United States and the State of Maryland being damaged in an amount to be established at trial or upon motion.

## COUNT III
### (All Defendants)

**(31 U.S.C. Section 3729(a)(3) (Federal False Claims Act)**
**(Md. Code Ann. (Health General) § 2-602 Maryland False Claims Act)**
**(Knowingly Engaging In a Conspiracy In Violation of the False Claims Act)**

82.     Plaintiff re-alleges and incorporates by reference all allegations in the Complaint as if specifically reiterated herein.

83.     By virtue of the acts described herein, Defendants have knowingly submitted, or caused to be submitted, false or fraudulent claims for payment to officials of the United States

Government and/or State of Maryland in violation of the Federal False Claims Act, 31 U.S.C. §

3729 *et seq*., and the Maryland False Claims Act, Md. Code Ann. (Health-General) § 2-602 *et*

*seq.* by knowingly and willfully conspiring with SNFs, hospitals and physicians to present or

caused to be presented false or fraudulent claims for payment to the United States Government

and the State of Maryland.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff-Relator, on behalf of himself, the United States of

America and the State of Maryland, demands judgment against Defendants as follows:

A.   All Counts

    (a)   Treble the amount of damages sustained by the United States, in an

        amount to be established at trial equal to the amount of false claims

        submitted by Defendant;

    (b)   Assessment of a civil penalty of $11,000 for each false or fraudulent claim

        that Defendant made or caused to be made to the government;

    (c)   All other necessary and proper relief, including the costs of this action.

In addition, Plaintiff-Relator, on his behalf further demands:

    (a)   That, in the event that the United States of America or the State of

        Maryland proceed with this action or otherwise settle these claims, the

        Court award to Plaintiff-Relator an amount of the proceeds of this action

        or settlement of these claims of not less than 15% and as much as 25%

        pursuant together with an amount of reasonable expenses incurred by

        Plaintiff-Relator, plus reasonable attorneys' fees and all costs and

        expenses incurred by the Plaintiff-Relator in bringing this action.

(b)   That in the event that the United States of America does not proceed with this action, the Court award to Plaintiff-Relator an amount of the proceeds of this action or settlement of claims of not less than 25% and as much as 30% pursuant to 31 U.S.C. 3730 (together with an amount of reasonable expenses incurred by Plaintiff-Relator, plus reasonable attorneys' fees and all costs and expenses incurred by the Plaintiff-Relator in bringing this action.

(c)   Such other and further relief that this Court deems just and proper.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff-Relator demands trial by jury.

Dated: July 29, 2013

/s/ Stephen B. Lebau
Stephen B. Lebau
Lebau & Neuworth, LLC
6060 Baltimore Avenue, Suite 201
Towson, Maryland 21204
410.296.3030
sl@joblaws.net

/s/ J. Stephen Simms
J. Stephen Simms (#4269)
John T. Ward
M. Scotland Morris
Simms Showers LLP
20 S. Charles Street, Suite 702
Baltimore, Maryland 21201
410.783.5795
jssimms@simmsshowers.com
jtward@simmsshowers.com
msmorris@simmsshowers.com

Attorneys for Relator Ravi Srivastava